Filed 10/25/21

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

----

| | |
|---|---|
| THE PEOPLE, | C090229 |
| Plaintiff and Respondent, | (Super. Ct. No. P14CRF0161) |
| v. | |
| RYAN NEAL SHROPSHIRE et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of El Dorado County, Kenneth J. Melikian, Judge. Affirmed as modified.

Ross Thomas, under appointment by the Court of Appeal, for Defendant and Appellant Ryan Neal Shropshire.

Michael C. Sampson, under appointment by the Court of Appeal, for Defendant and Appellant Bryan Edward Roberts.

---

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of Parts II-IX.

1

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Michael A. Canzoneri, Heather S. Gimle, Deputy Attorney General, for Plaintiff and Respondent.

Defendants Ryan Neil Shropshire and Bryan Edward Roberts appeal from a judgment of conviction in El Dorado County following a jury trial.  Roberts was convicted of multiple counts, including two counts of receiving stolen property, unlawful possession of methamphetamine, unlawful possession of ammunition, two counts of receiving a stolen motor vehicle, possession of a deadly weapon, and three counts of possession of a firearm by a felon.  Shropshire was convicted of manufacturing concentrated cannabis.

Defendants raise numerous issues on appeal.  In the published portion of our opinion, we agree with Shropshire that he is entitled to additional custody credits.  Shropshire was serving a two-year sentence in a separate case from Placer County while he awaited trial in the instant case, and the sentence in the Placer County case was reduced to a misdemeanor before Shropshire was sentenced in the instant case.  Because he had accrued more custody credits than was necessary to serve the sentence in the Placer County case, defendant was entitled to apply those excess credits to his sentence in the instant case, as we will explain.

In the unpublished portion of our opinion, we reject Roberts' and Shropshire's challenges to a search warrant authorizing a search for stolen property.  We also disagree with Roberts' remaining contentions except that one of his convictions for unlawful possession of a firearm must be stayed pursuant to Penal Code section 654,[1] and reject Shropshire's remaining claims except that a one-year prior prison term enhancement imposed pursuant to section 667.5, subdivision (b) should be stricken.

---

[1]  Further undesignated statutory references are to the Penal Code.

2

Accordingly, we will modify the judgments as to both defendants and affirm the judgments as modified.

## FACTS AND PROCEEDINGS

Because some of defendants' claims require close examination of the evidence presented at trial, we recite the facts in some detail where necessary. We omit other facts where their recitation is not necessary to decide the claims on appeal.

*September 17, 2012, Search of Dewer Road Property*

Deputy Terri Cissna was a deputy sheriff with the El Dorado County Sheriff's Department. On September 17, 2012, she executed a search warrant for marijuana at a property on Dewer Road in Garden Valley (Dewer Road property). The property was owned by Roberts and his wife, and occupied by his family. Roberts was not present when the warrant was served. Cissna met Shropshire, who lived on the property. Cissna found two shotguns--one of which had a barrel shorter than lawfully permitted--and one rifle on a shelf in the master bedroom, along with indicia of Roberts' occupancy of the room.

On October 13, 2012, after numerous attempts to contact Roberts, Cissna pulled him over in order to interview him. Roberts said that with the exception of one, the guns belonged to someone else.

*Thefts from the Bear Creek Road Property*

Kurtis H. lived on a property on Bear Creek Road in El Dorado County (Bear Creek Road property) from June 2012 to June 2013. After moving from the Bear Creek Road property in June 2013, he left items belonging to Brad H., the owner of the real property and personal property thereon; among the items were two ATVs and other equipment, including generators and air compressors. The generators and air compressors were stored in a garage shop, which was secured with locking doors and bolts in the bay doors.

3

After moving from the Bear Creek Road property, Kurtis continued to check on it. At the end of November 2013, he observed the shop's window screen was on the ground, and he realized that property was missing, including two air compressors, two generators, a small vehicle ramp for all-terrain vehicles (ATVs), and two ATVs. The property's front gate was still locked, but there were ATV trails leading from the property; one led to the Dewer Road property.

Kurtis testified at trial that Charles S. was the previous owner of the property, although he acknowledged that he told police that Charles was the owner of the property at the time of the theft. The confusion was caused by the fact that Charles was in the process of selling the property to Brad, and Kurtis was not sure if the transaction had been completed at the time of the theft.

Nevertheless, Kurtis communicated with Brad in November. Kurtis obtained photos and vehicle identification numbers (VIN) provided by the owner of the property and created flyers in an attempt to find the property. On cross-examination, Kurtis testified he might have obtained the photographs for the flyers from Charles, although he did not contact Charles after the theft.

Kurtis did not know if Charles did something with the property, but he testified that Charles lived in Las Vegas and had not "been back around for a while." Kurtis did not know Roberts or Shropshire, and he did not give them permission to take the property. Neither Brad nor Charles testified at trial.

Around November 24 and 25, 2013, Deputy Cissna received the reward posters for the property that Kurtis reported stolen. She contacted Kurtis, who explained that the items had been stolen from the Bear Creek Road property.

Diane B. lived near the Bear Creek Road property in 2014, and she knew Kurtis and was familiar with Charles. Diane knew that Kurtis moved off the property--she thought in October or November--and that it was unoccupied. She occasionally went to the property and observed that "[t]hings were moved around all the time. The doors left

4

open on the house and everything." She observed that things were missing from the garage, but she could not discern if anything was missing from the shop because it was so messy. Diane attempted to contact Charles, but the record does not reflect that she was able to reach him.

Diane was familiar with Roberts and Shropshire, whom she knew as "Chevy." She had a surveillance camera on her house, and she could see what was happening in the neighborhood. She told Deputy Cissna that she had observed both Roberts and Shropshire walking "alongside the gate" in October. She did not see them enter the Bear Creek Road property because they went out of view of the camera, but they were going in that direction.

Diane frequently heard ATVs on the property during the period of time it was unoccupied. She once saw Roberts riding an ATV. Roberts once asked Diane if the ATVs bothered her. When Diane heard the ATVs, she noticed that no one came through the front gate of the Bear Creek Road property, which was visible on her camera.

*February 17, 2014, Search of Dewer Road*

On February 17, 2014, Deputy Cissna executed a search warrant related to stolen property at the Dewer Road property. She found the two ATVs that had been reported stolen from the Bear Creek Property and an air compressor. She also discovered an illegally graded access trail connecting the Dewer Road property to the Bear Creek Road property. She found the ATVs in a drainage ditch on the ATV trail "a couple hundred yards south of the main house on Dewer," although she may have testified at the preliminary hearing that the ATVs were at least 300 yards from the residence, and she was not certain the ATVs were located on the Dewer Road property. She hypothesized that one ATV had become stuck, and the other one became stuck attempting to rescue the first. One had a broken tire or wheel.

5

Deputy Cissna found a travel trailer on the Dewer Road property in close proximity to the main house; the trailer had various items in it, including nine boxes of ammunition that looked "newer-ish." She also found fired shotgun shells a short distance behind the Roberts' residence. Some of the shells were "somewhat dirty to indicate they'd been on the ground for a little bit, while others are relatively clean, indicating they have not been exposed to the weather for very long." She searched Roberts' truck and discovered a bag containing a small amount of methamphetamine, and a jar of concentrated cannabis product.

Deputy Cissna and another deputy searched a recreational vehicle (RV) on the property. The RV contained indicia related only to Shropshire. Inside, the deputies found equipment for producing concentrated cannabis, and marijuana and concentrated cannabis residue and product.

During an additional search conducted on another property in Grass Valley on February 20, 2014, deputies discovered, inter alia, generators, air compressors, and aluminum ramps that had been reported stolen from the Bear Creek Road property. Kurtis provided identifying marks and numbers for the items, identifying them as stolen.

*Charges, Verdicts, and Sentences*

The jury found Roberts guilty of receiving stolen property, to wit, the ATVs and the air compressors, generators, and ramps (Pen. Code, § 496, subd. (a); counts 1 & 8); possession of methamphetamine (Health & Saf. Code, § 11377, subd. (a); count 3); unlawful possession of ammunition (Pen. Code, § 30305, subd. (a)(1); count 5); receiving a stolen motor vehicle (*id.*, § 496d, subd. (a); counts 10 & 11); possession of a deadly weapon (*id.*, § 33215; count 12); and possession of a firearm by a felon (*id.*, § 29800, subd. (a)(1); counts 13-15). Roberts admitted that he was out on bail at the time he committed the acts charged in counts 1, 3, and 5.

6

The trial court sentenced Roberts to an aggregate term of four years in prison:  the midterm of two years on count 1, and a consecutive two-year sentence on the on-bail enhancement.  The court imposed a concurrent 180-day sentence on count 3, and a concurrent two-year sentence on all other counts.

The jury found Shropshire guilty of manufacturing concentrated cannabis. (Health & Saf. Code, § 11379.6, subd. (a); count 2.)  Shropshire admitted one prior prison term allegation (Pen. Code, § 667.5, subd. (b)), and the trial court sentenced him to an aggregate term of eight years of incarceration:  an aggravated term of seven years on count 2, plus one year for the prior prison term.  The court directed that five years of the term be served in county jail (*id.*, § 1170, subd. (h)(2)) with the balance served under mandatory supervision.

Each defendant timely appealed.  The case was fully briefed in May 2021, and deemed submitted after waiver of oral argument in September 2021.

## DISCUSSION

### I

### *Shropshire's Credits*

Shropshire contends that he is entitled to 377 days of presentence credits for time served.  He contends that he is entitled to credits he earned while serving a two-year sentence on another case, the sentence of which was subsequently reduced to a misdemeanor.  Because he earned credits while serving that sentence that exceeded the amount required to fulfill that sentence as reduced, he contends the excess credits should be applied to the instant case.  As we will explain, we agree.

A. *Background*

On February 17, 2014, Shropshire was arrested in Placer County, and two days later he was charged in Placer County Superior Court case No. 62-128342 with possession of concentrated cannabis, a felony.  (Health & Saf. Code, § 11357.)  He was

7

jailed in Placer County from February 17, 2014,[2] until June 23, 2014; he was transferred to the El Dorado County Jail on June 24, 2014.

On March 11, 2014, Shropshire was charged in the instant case, and an arrest warrant was issued by El Dorado County Superior Court on March 17.

On August 15, 2014, Shropshire was sentenced to two years in the Placer County case. On August 26, 2014, the El Dorado County Superior Court received a demand pursuant to section 1381, and Shropshire was arraigned on September 26, 2014, while in the custody of the El Dorado County Sheriff's Department.

Shropshire remained in custody in the El Dorado County Jail until November 24, 2014, when he posted bond. He was returned to jail in Placer County on November 26, 2014, where he remained until December 11, 2014, when his felony conviction in the Placer County case was reduced to a misdemeanor with a maximum term of confinement of 364 days (§ 18.5, subd. (a)); he was awarded credit for 298 actual days.

When Shropshire was sentenced in the instant case on August 12, 2019, the court awarded him 91 actual days of credit--he was in custody in the El Dorado County Jail from March 28, 2018, to April 19, 2018, and from June 6, 2019, to August 12, 2019--plus 90 conduct days of credit, for a total of 181 days. Shropshire's probation report asserted that he was not entitled to credits from the time he spent in custody before his Placer County conviction was reduced to a misdemeanor because he was serving the two-year sentence in the Placer County case at that time.

---

[2] Shropshire's probation report states that he was jailed in Placer County from February 21, 2014, to June 23, 2014. However, a printout from the Placer County Sheriff, attached to Shropshire's supplemental points and authorities in support of his request for additional credits, states that Shropshire was jailed in Placer County from February 17.

8

Shropshire filed a motion seeking additional credits. He observed that he had accrued 298 actual days--596 credit days--in custody,[3] and because he was resentenced to a maximum sentence of 364 days, there were 232 custody days, or 116 actual days, during which he was only legally held on the El Dorado County case. Accordingly, Shropshire argued that those excess credit days should be attributed to his sentence in the instant case. The People filed a brief in opposition of Shropshire's request for additional credits. Shropshire then filed supplemental points and authorities in support of his motion. On November 8, 2019, the trial court denied Shropshire's motion.

B. *Legal Background*

Section 2900.5, subdivision (b) requires that presentence custody credit "shall be given only where the custody to be credited is attributable to proceedings related to the same conduct for which the defendant has been convicted." As our high court recognized long ago, this language means that "a defendant is not to be given credit for time spent in custody if during the same period he is already serving a term of incarceration." (*In re Rojas* (1979) 23 Cal.3d 152, 155-156.) This is so because the defendant would have been in custody serving the earlier sentence had there been no other matters pending; thus, the proceedings in any later pending case have no effect upon the defendant's liberty. (*Ibid.*)

Subsequently, our Supreme Court has held: "[A] period of time previously credited against a sentence for unrelated offenses cannot be deemed 'attributable to proceedings' resulting in a later-imposed sentence unless it is demonstrated that the claimant would have been at liberty during the period were it not for a restraint relating to the proceedings resulting in the later sentence. In other words, duplicative credits against separately imposed concurrent sentences for unrelated offenses will be granted only on a showing of strict causation." (*In re Joyner* (1989) 48 Cal.3d 487, 489 (*Joyner*).)

---

[3] This reflects the number of days between February 17, 2014, and December 11, 2014.

In *People v. Bruner* (1995) 9 Cal.4th 1178, at pages 1180 to 1181 (*Bruner*), the court applied *Joyner*: "[W]hen presentence custody may be concurrently attributable to two or more unrelated acts, and where the defendant has already received credit for such custody in another proceeding, the strict causation rules of *Joyner* should apply. Here, defendant received credit for all presentence custody in his parole revocation proceeding, and he has failed to demonstrate that but for the cocaine possession leading to his current sentence, he would have been free, or at least bailable, during that presentence period. Hence, he is not entitled to duplicative credit against the current sentence."

However, subsequent decisions have recognized that the "strict causation" rule in *Joyner* and *Bruner* does not apply when the defendant is not seeking duplicate credits. For example, in *In re Marquez* (2003) 30 Cal.4th 14 (*Marquez*), the defendant was arrested in Monterey County and was released on bail. While on bail, he was arrested in Santa Cruz County for an unrelated crime, and Monterey placed a hold on him. He was convicted in the Santa Cruz case, and the trial court gave him credit for the time he spent in custody from the date of his Santa Cruz arrest to the date he was sentenced in that case. The defendant was subsequently convicted in the Monterey case, and the trial court awarded him credit for the time he spent in custody after the Monterey County hold and before he was sentenced in the Santa Cruz case, but not for the time after he was sentenced in the Santa Cruz case but before he was sentenced in Monterey County. Our Supreme Court concluded that he was entitled to the credits.

The court reasoned that when Monterey placed a hold on the defendant subsequent to his arrest in the Santa Cruz case, his custody became attributable to the pending criminal charges in both Santa Cruz and Monterey. (*Marquez*, *supra*, 30 Cal.4th at p. 20.) Had Santa Cruz dropped its charges at that time, the subsequent period in custody would have been attributable solely to the Monterey hold. (*Ibid*.) The court held that once Santa Cruz dismissed its charges, all custody following Monterey's hold, including

10

the period between the defendant's sentencing in Santa Cruz and his sentencing in Monterey, became attributable to the Monterey case.  (*Id*. at p. 20.)

The court observed:  "To deny [the defendant] credit for his time spent in custody between December 11, 1991, and April 2, 1992, would render this period 'dead time,' that is, time spent in custody for which he receives no benefit.  Sometimes this result is unavoidable.  For example, had [the defendant's] Santa Cruz County presentence custody been attributable solely to the Santa Cruz County charges (that is, had Monterey County never placed a hold), dismissal of the Santa Cruz County charges would have left petitioner with no sentence against which credit for that period could be applied.  But because his custody after placement of the Monterey County hold was attributable to both his Santa Cruz and Monterey County cases, dismissal of the Santa Cruz County charges still left him with the Monterey County sentence against which credit for all of his custody from placement of the Monterey County hold until imposition of sentence could be applied."  (*Marquez*, *supra*, 30 Cal.4th at pp. 20-21.)

The *Marquez* court further recognized that, once the Santa Cruz conviction was reversed, the defendant was "returned to a situation indistinguishable from that of a defendant who had been charged in that county, but never tried."  (*Marquez*, *supra*, 30 Cal.4th at p. 22.)  Accordingly, when the Santa Cruz charges were dismissed, "the 'custody to be credited' (i.e., the time [the defendant] had spent in local custody pursuant to the Monterey County hold, both before and after the date of the Santa Cruz County sentencing) became 'attributable [solely] to proceedings related to the same conduct for which the defendant has been convicted' (§ 2900.5[, subd.] (b)), i.e., the proceedings in this case.  The Monterey County Superior Court thus properly awarded [the defendant] credit for his custody from the time of the hold until the date of his sentencing in Santa Cruz County.  It erred, however, in failing to award him credit for his custody following his sentencing in Santa Cruz County, up to and including the date of his sentencing in Monterey County."  (*Id*. at pp. 22-23.)

11

The Attorney General in *Marquez* argued that application of the rule of "strict causation" precluded an award of additional credits in that case. Disagreeing, the court explained: "This argument is misplaced. The requirement of 'strict causation,' on which this court relied in *Bruner*, *supra*, 9 Cal.4th 1178, and *Joyner*, *supra*, 48 Cal.3d 487, is applicable in cases involving the possibility of *duplicate credit* that might create a windfall for the defendant. Here, because the Santa Cruz County charges have been dismissed, no possibility of a windfall (in the form of double credit) to [the defendant] exists. Unlike in *Bruner* and *Joyner*, the choice is not between awarding credit once or awarding it twice. The choice is instead between granting [the defendant] credit *once* for his time in custody between December 11, 1991, and April 2, 1992, or granting him *no credit at all* for this period of local custody." (*Marquez*, *supra*, 30 Cal.4th at p. 23.)

In *People v. Torres* (2012) 212 Cal.App.4th 440, the defendant pleaded guilty to an offense, and the trial court imposed a sentence that included reduction of a prior sentence the defendant was serving at that time. The sentence reduction meant that the prior sentence was effectively served several months earlier, but the trial court denied presentence credits to the current sentence. The appellate court concluded that once the defendant's newly-reduced term had been fulfilled, any time spent after fulfilling that sentence should have been credited to the current sentence. (*Id.* at p. 445.) The court stated: "Here, the period of [the defendant's] custody between his sentencing in Sonoma and his sentencing in Mendocino (June 17, 2011, to Nov. 4, 2011) is attributable to both the Sonoma County case and the Mendocino County cases. Following the reasoning of *Bruner* and *Joyner*, it appears the trial court concluded that section 2900.5 subdivision (b)'s prohibition applied to deny [the defendant] credits for this period and thus determined that any credits earned during it could only apply to the Sonoma County sentence. However, because the court reduced [the defendant's] Sonoma County sentence from a two-year term to an eight-month term, and [the defendant] had previously been awarded 366 days of credit toward that sentence, [the defendant's]

12

Sonoma County sentence was completed well before he was sentenced in Mendocino County. [¶] . . . Thus, once the modified Sonoma County sentence was fulfilled, the remaining custodial time was and should have been 'characterized as solely attributable' to the controlling Mendocino case and allocated accordingly." (*Id.* at p. 447.)

C. *Analysis*

On appeal, Shropshire contends that he was legally held on the Placer County case for only 182 actual days, based on the fact that he was resentenced to a misdemeanor, which carried a maximum sentence of 364 days. Accordingly, he contends that he fulfilled his sentence on August 17, after which his remaining custodial time was solely attributable to the instant case.

We agree. Shropshire's time in custody from February 17 to December 11 was attributable to the Placer County case. But as *Marquez* instructs, Shropshire's time in custody from March 11--when the El Dorado Superior Court issued an arrest warrant (see *Joyner*, *supra*, 48 Cal.3d at p. 489, fn. 2)--to November 24--when he posted bond in the El Dorado County case--was also attributable to that case. Like the Santa Cruz case in *Marquez*, had Shropshire's Placer County case not been reduced to a misdemeanor, each of the days from February 17 to December 11--298 actual days in custody--would have been attributed to the Placer County case in fulfilling his two-year sentence.

However, when the Placer County case was reduced to a misdemeanor, the custody time in excess of that required to fulfill the Placer County case was no longer required to be attributed to the Placer County case, and was available to be attributed to the El Dorado County case. As *Marquez* recognized, to deny Shropshire credit for his time spent in custody between August 18 and November 24 would render that period "dead time," or time spent in custody for which Shropshire would receive no benefit. (*Marquez*, *supra*, 30 Cal.4th at pp. 20-21.) While "dead time" may be unavoidable in some circumstances, it is not unavoidable here because Shropshire was being held on the El Dorado County case from August 18 to November 24.

13

In response, the Attorney General relies exclusively on the "strict causation" rule stated in *Joyner*. But as the court stated in *Marquez* and as relevant here, the application of the rule of "strict causation" is not applicable where there is no risk of a windfall for Shropshire. (*Marquez*, *supra*, 30 Cal.4th at p. 23.) As we have discussed, there is no dispute that Shropshire may not--nor is he seeking to--apply his custody credits to two separate sentences. Rather, "[t]he choice is instead between granting [the defendant] credit *once* for his time in custody between [August 19, 2014, and November 24, 2014,] or granting him *no credit at all* for this period of local custody." (*Marquez*, *supra*, 30 Cal.4th at p. 23.) Accordingly, we conclude that Shropshire must be awarded credit against the sentence in the instant case for the time he spent in custody from August 18 to November 24, 2014.

## II

### *Search Warrant*

Both Roberts and Shropshire challenge the validity of the search warrant executed on February 17, 2014. Roberts argues that the judgment in counts 1, 8, 10, and 11 must be reversed because the information supporting the search warrant, which led to the seizure of evidence supporting those counts, was unconstitutionally stale; Shropshire joins that argument. Additionally, Shropshire contends that the warrant failed to specifically identify his RV as a location to be searched, and Deputy Cissna knew that Shropshire's RV was not part of Roberts' residence. The Attorney General responds that the warrant set forth an ongoing criminal enterprise involving stolen property that was likely to be found at the Dewer Road property at the time of the execution of the warrant, and therefore the information supporting the warrant was not unconstitutionally stale.

A panel of this court previously addressed and rejected each of defendants' arguments in the context of Shropshire's appeal from the conviction in his Placer County case, which we described *ante*. In the previous appeal, Shropshire challenged the trial court's denial of his motion to quash the same warrant at issue here. (*People v.*

14

*Shropshire* (July 21, 2017, No. C077218) [nonpub. opn.] Cal. App. Unpub. Lexis 4939, as modified on denial of rehg. (Aug. 11, 2017) (*Shropshire I*)). As we will explain, Shropshire's claims are barred by the doctrine of res judicata, and we adopt and apply the reasoning in *Shropshire I* to Roberts' claims.

A. *Standard of Review*

In reviewing the trial court's denial of a motion to suppress evidence obtained pursuant to a warrant, this court "defer[s] to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, [this court] exercises [its] independent judgment." (*People v. Glaser* (1995) 11 Cal.4th 354, 362.) The purpose of our review is to ensure that the magistrate's issuance of the warrant was based on an independent judicial determination of the facts, and not on the magistrate's "rubber stamp" approval of the police officer's affidavit. (*People v. Smith* (1980) 108 Cal.App.3d 843, 851.)

B. *Shropshire I*

On February 16, 2014, Deputy Cissna sought a warrant to search the Roberts' home and the Dewer Road property. We set forth the information supporting the search warrant in *Shropshire I*, *supra*, Cal. App. Unpub. Lexis 4939 at pp. *2-*8. The warrant was executed on February 17, 2014, as discussed *ante*.

In addition to the evidence seized during the search, on the same day the search warrant was executed, Shropshire was found to be in possession of a usable amount of concentrated cannabis while driving a vehicle in Placer County. (*Shropshire I*, *supra*, Cal. App. Unpub. Lexis 4939 at p. *9.) He was subsequently charged with offenses in Placer County including one count of possession of marijuana for sale (Health & Saf. Code, § 11359), and one count of possession of concentrated cannabis (*id.*, § 11357, subd. (a)). (*Shropshire I*, at p. *9.)

15

Shropshire filed a motion to quash and suppress evidence seized during the search. (*Shropshire I*, *supra*, Cal. App. Unpub. Lexis 4939 at pp. *9-*10.) He argued in part that the statement of probable cause in support of the warrant was deficient because it was based on stale information. (*Id*. at p. *10.) The trial court recognized that the search warrant application was "pretty thin" and that it was "close whether there is probable cause given all the facts." (*Id.* at p. *15.) Nevertheless, the court deferred to the magistrate because "reasonable minds can differ," and it concluded that there was no evidence that the officers acted in bad faith or made any false statements or representations. (*Ibid.*)

On appeal, Shropshire claimed the information supporting the warrant did not establish probable cause, was unconstitutionally stale, and Deputy Cissna did not have a good faith belief in the validity of the warrant. (*Shropshire I*, *supra*, Cal. App. Unpub. Lexis 4939 at p. *16.) First, we concluded the affidavit prepared by Cissna was legally sufficient under the totality of the circumstances to demonstrate probable cause to support the warrant. (*Id.* at pp. *16-*17.) Next, we rejected Shropshire's argument that the evidence relied upon was too stale. We concluded: "There is no specific limitation upon the age of information which may be relied upon in support of a search warrant. Rather, the rule is that the showing in support of a warrant must establish a fair probability seizable property is currently on the premises to be searched. (*People v. McDaniels* (1994) 21 Cal.App.4th 1560, 1564.) Evidence that an activity is continuing rather than isolated or irregular may be considered in support of an inference that seizable property will remain on the premises. (*People v. Brown* (1985) 166 Cal.App.3d 1166, 1170.) 'Courts have upheld warrants despite delays between evidence of criminal activity and the issuance of a warrant, when there is reason to believe that criminal activity is ongoing or that evidence of criminality remains on the premises.' (*People v. Carrington* (2009) 47 Cal.4th 145, 164 [fair probability that stolen checks remained at the defendant's home two months after burglary because they could still be forged and cashed]; see also *People*

16

*v. Mikesell* (1996) 46 Cal.App.4th 1711, 1714-1715, 1718 [affidavit based on information two to four years old, combined with current information, painted picture of continuing participation in drug trade].) This is particularly the case when, as Deputy Cissna declared in her affidavit, there is reason to suspect that the subjects may be retaining stolen property for personal use or waiting for the opportunity to sell the stolen property. Accordingly, we conclude the information in the affidavit was not stale and established probable cause for issuance of the warrant." (*Shropshire I*, *supra*, Cal. App. Unpub. Lexis 4939 at pp. *23-*24.)

We then concluded that, even if the warrant was invalid, the good faith exception to the exclusionary rule applied. (*Shropshire I*, *supra*, Cal. App. Unpub. Lexis 4939 at pp. *24-*26.) We observed that a police officer may rely in good faith on a warrant later found to be invalid. (*Id.* at p. *24, citing *United States. v. Leon* (1984) 468 U.S. 897, 922 (*Leon*).) We recognized: " 'In most cases, the fact that a warrant was issued by a neutral and detached magistrate will suffice to establish that the officer has acted in good faith in conducting the search,' " although that exception does not apply where the warrant is " 'based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." ' " (*Ibid.*, first quoting *People v. Spears* (1991) 228 Cal.App.3d 1, 19, then quoting *Leon*, at p. 923.) Finally, we noted that where " 'a well-trained officer reasonably could have believed that the affidavit presented a close or debatable question on the issue of probable cause,' the evidence should not be suppressed." (*Id.* at p. *25.)

In applying those governing principles, we concluded that Deputy Cissna's reliance on the validity of the warrant was objectively reasonable. (*Shropshire I*, *supra*, Cal. App. Unpub. Lexis 4939 at p. *25.) We concluded: "First, in the affidavit, Deputy Cissna detailed a significant history of thefts in a remote part of Garden Valley with some physical evidence leading to the Dewer Road property, including tracks on ATV trails connecting the property with both the Jeep dump site and [the Bear Creek Road] property

17

and some of . . . smaller stolen items [from the Bear Creek Road property] scattered along those trails. Second, as it appeared in the affidavit, some of the information provided by [informants] corroborated Deputy Cissna's suspicions about Roberts and [Shropshire] using these back road trails and using a backhoe, which Deputy Cissna suspected was stolen, to expand these trails. Third, the affidavit provided evidence of these informants' credibility based on Deputy Cissna's prior interactions with them and information obtained from them in investigating other cases. Finally, Deputy Cissna detailed her prior investigations of stolen vehicles and equipment on the Dewer Road property, [Shropshire's] interest in off-road vehicles, and Roberts's and [Shropshire's] criminal records involving vehicle theft. [¶] Viewing the affidavit as a whole, Deputy Cissna's 'application for a warrant clearly was supported by much more than a "bare bones" affidavit.' (*Leon*, *supra*, 468 U.S. at p. 926.) We cannot say that she should have *known* that her affidavit failed to establish probable cause." (*Id.* at pp. *25-*26.)

In a footnote, we also addressed the argument Shropshire raises here, that the warrant was insufficiently specific as to the places to be searched. (*Shropshire I*, *supra*, Cal. App. Unpub. Lexis 4939 at p. *24, fn. 6 [as modified Aug. 11, 2017].) We concluded: "Defendant misreads the warrant. Not only does it specify a list of structures on the property that would necessarily include [Shropshire's] trailer, in attachment B, it specified '[a]reas of the residence, property, sheds, garages, barns, storage units, any and all vehicles, trailers and RV's under control of and having access to' both Roberts *and* [Shropshire]. As we have reasoned above, there was probable cause for searching *both* Roberts's and [Shropshire's] dwelling units on the property and the warrant was sufficiently specific that defendant's trailer was subject to search. (See *People v. MacAvoy* (1984) 162 Cal.App.3d 746, 753 [there must be probable cause to search each dwelling unit].) [Shropshire's] argument is meritless." (*Ibid.*)

18

C. *Procedural Background*

After the trial court in Shropshire's Placer County case denied Shropshire's motion to quash, but before we issued our opinion in *Shropshire I*, Shropshire filed a similar motion in the instant case; Roberts joined Shropshire's motion. The trial court denied the motion, it ruled: "There has been nothing showing that there was any misleading statements on behalf of the deputies in question. No attack on the information, et cetera. So there's nothing for the Court to excise. [¶] But - - and in reviewing them, there is more than sufficient evidence to issue each of the search warrants in question, so I'll deny the motion to suppress."

D. *Res Judicata*

The Attorney General argues that the doctrine of res judicata should be applied to defendants' arguments because these issues were litigated in *Shropshire I*. Roberts argues that we are not required to consider an issue discussed only in a footnote, as the argument is presented by the Attorney General here. (*Evans v. CenterStone Development Co.* (2005) 134 Cal.App.4th 151, 160.) Although we agree that we are not required to consider the argument, we *may*, and here we choose to do so.

" 'The doctrine of res judicata rests upon the ground that the party to be affected, or some other with whom he is in privity, has litigated, or had an opportunity to litigate the same matter in a former action in a court of competent jurisdiction, and should not be permitted to litigate it again to the harassment and vexation of his opponent.' [Citation.] The doctrine of res judicata—or claim preclusion—adheres when (1) the issues decided in the prior adjudication are identical with those presented in the later action; (2) there was a final judgment on the merits in the prior action; and (3) the party against whom the plea is raised was a party or was in privity with a party to the prior adjudication." (*Pollock v. University of Southern California* (2003) 112 Cal.App.4th 1416, 1427.) The doctrine of res judicata applies to Shropshire's claims on appeal regarding the search warrant. Shropshire raised each of the arguments he raises here in *Shropshire I*, there

19

was a final judgment on the merits in the prior action, and Shropshire was the party in the prior case.

Roberts argues that he was not a party nor in privity with a party to *Shropshire I*. We agree; the doctrine of res judicata does not apply to him. However, the court in *Shropshire I* addressed the specific staleness argument Roberts raises here, and it concluded that the argument lacked merit. We conclude the decision in *Shropshire I* was well-reasoned, and we adopt it here with respect to Roberts' claim of staleness.

## III

### *Sufficiency of the Evidence of Counts 1 and 8*

Roberts contends that his convictions for receiving stolen property in count 1--the ATVs--and count 8--the generator, and air compressors, and aluminum ramps--must be reversed because there is insufficient evidence to support the finding that the evidence was stolen. He argues there was no evidence at trial regarding who owned the property; Kurtis acknowledged he did not own the property, did not know whether Brad or Charles owned it, and did not know if Charles had lawfully disposed of the property. The Attorney General responds that the record supports the finding that the ATVs, air compressors, aluminum ramps, and generator were stolen. We agree with the Attorney General.

A. *Standard of Review*

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.] In so doing, a reviewing court 'presumes in support of the judgment the

20

existence of every fact the trier could reasonably deduce from the evidence.' " (*People v. Edwards* (2013) 57 Cal.4th 658, 715.) " 'We do not reweigh evidence or reevaluate a witness's credibility.' " (*People v. Houston* (2012) 54 Cal.4th 1186, 1215.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

 B. *Analysis*

 Section 496, subdivision (a) makes it a crime for any person to "buy[] or receive[] any property that has been stolen or that has been obtained in any manner constituting theft or extortion, knowing the property to be so stolen or obtained." A defendant cannot be found guilty of receiving stolen property unless the prosecutor proves beyond a reasonable doubt that the property was stolen. (*People v. Price* (1991) 1 Cal.4th 324, 464; *People v. Kunkin* (1973) 9 Cal.3d 245, 249.)

 Roberts argues that the evidence at trial did not conclusively establish who owned the property at issue in counts 1 and 8, and therefore no substantial evidence supports the finding that the property was actually stolen. He relies on *People v. Rodgers* (1970) 4 Cal.App.3d 531 (*Rodgers*) and *People v. Bailey* (1969) 273 Cal.App.2d 99 for the proposition that it is "virtually impossible" to prove that property is stolen without testimony from the owner of the property. In *Rodgers*, *supra*, 4 Cal.App.3d at page 532, the defendant was arrested while driving a car that did not belong to him. The owner of the car did not testify, but her husband testified that he parked the car in a garage and locked it, and two days later it was gone. (*Id.* at p. 533.) The court noted that there was no evidence about the owner's activities or her arrangements, and it was possible that she gave her consent to the defendant to drive the car. (*Id.* at pp. 533-534.)

 *Rodgers* is distinguishable from the facts here. Where, in that case, there was no evidence of the car owner's arrangements, here there was substantial evidence that the owner of the property did not authorize Roberts to use the property, whether Brad or

Charles actually owned it. First, there is substantial evidence that Brad did not authorize anyone to use the property. Kurtis testified that he checked on the property periodically to ensure that nothing went missing. In November 2013, he saw that a window screen to the shop was on the ground, and property was missing. The front gate was locked, evidence that no one had entered or left the property through the front gate. The shop, however, was easily accessed from the Dewer Road property via an ATV trail. Kurtis spoke with Brad after he realized property was missing, and he obtained pictures and VINs from "the owner of the property" to see if anything could be found. Thus, while Brad did not testify, there is substantial evidence that Brad did not authorize Roberts to use the property.

Roberts argues that Kurtis acknowledged that Charles might have still owned the property at the time of the theft, although he was in the process of selling the property to Brad, and the prosecution did not present evidence proving that Charles did not authorize someone to use the property. We disagree there is no such evidence. First, Kurtis testified that Charles lived in another state and had not "been back around for a while." Diane attempted to contact Charles after she realized things were going missing, but she was not able to contact him. There is nothing to suggest he was in contact with defendants to give them permission to take possession of the stolen property.

Second, Brad was in the process of purchasing the real and personal property from Charles, and there is no evidence that Brad was aware that Charles was selling some of the personal property without his knowledge. Rather, Brad assisted Kurtis in preparing the flyers to retrieve the stolen property. Indeed, the fact that Brad possessed the VINs and pictures of the property and assisted Kurtis in retrieving the property suggests that Brad had taken ownership the property at the time it was stolen.

Third, the manner of the taking supports the finding that the property was stolen, rather than sold or gifted. The shop window was removed and the front gate remained

22

locked, suggesting that the individuals who took the property were not authorized to do so. There is substantial evidence to support counts 1 and 8.

IV

*Jury Instructions*

Roberts contends that the verdict as to counts 1 and 8 must be reversed because the issue of whether the property was stolen was contested at trial, and the trial court failed to fully instruct the jury on the elements of theft. We disagree.

A. *Standard of Review*

Errors in jury instructions are questions of law, which we review de novo. (*People v. Guiuan* (1998) 18 Cal.4th 558, 569.) "Review of the adequacy of instructions is based on whether the trial court 'fully and fairly instructed on the applicable law.' " (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

B. *Background*

The trial court instructed the jury as to count 1 in relevant part that in order to find Roberts guilty of receiving stolen property, "the People must prove that: One, the defendant received . . . property that had been stolen, specifically two quads; second, when the defendant received the property, he knew that the property had been stolen; and third, the defendant actually knew of the presence of the property. [¶] Property is stolen if it's obtained by any type of theft, burglary or robbery." The court instructed the jury almost identically with respect to count 8: "To prove the defendant is guilty of this crime, the People must prove the following three elements: First, that the defendant received property that had been stolen, specifically air compressors, aluminum ramps, and a generator; second, when the defendant received the property he knew that the properties had been stolen; and third, the defendant actually knew of the presence of the property. [¶] Property is stolen if it was obtained by any type of theft or burglary or robbery."

23

"For property to be 'stolen' or obtained by 'theft,' it must be taken with a specific intent. 'California courts have long held that theft by larceny requires the intent to permanently deprive the owner of possession of the property.' [Citation.] An intent to *temporarily* deprive the owner of possession may suffice when the defendant intends 'to take the property for so extended a period as to deprive the owner of a major portion of its value or enjoyment . . . .' " (*People v. MacArthur* (2006) 142 Cal.App.4th 275, 280 (*MacArthur*).)

The parties did not request an instruction on the elements of theft by larceny, burglary, or robbery, and the court did not give any such instructions. But even in the absence of such a request, "[a] court must instruct sua sponte on general principles of law that are closely and openly connected with the facts presented at trial." (*People v. Brown* (2003) 31 Cal.4th 518, 559.) "That obligation comes into play when a statutory term 'does not have a plain, unambiguous meaning,' has a 'particular and restricted meaning' [citation] or has a technical meaning peculiar to the law or an area of law." (*People v. Roberge* (2003) 29 Cal.4th 979, 988.)

In *MacArthur, supra,* 142 Cal.App.4th 275, the defendant pawned jewelry given to him by his girlfriend. She often had given him jewelry belonging to her mother to pawn and had specified that the items should be pawned for a low amount so they would be easy to redeem. (*Id.* at pp. 277-278.) The appellate court noted that "pawning property does not transfer ownership or necessarily deprive the owner of possession permanently." (*Id.* at p. 281.) Under these particular circumstances, the court held that a jury should be instructed on the definition of the terms "stolen" and "obtained by theft." (*Id.* at p. 280.) The court noted the trial court had "failed to instruct the jury that theft requires a particular intent, leaving the jury with no basis for determining whether the jewelry had been stolen—an issue raised by the evidence." (*Ibid.*)

C. *Analysis*

At the outset, we reject two arguments raised by the Attorney General. He contends that Roberts forfeited this claim by failing to raise it at the trial court. But Roberts' claim is of a kind that did not require him to take action in the trial court to preserve it (see *People v. Lee* (2011) 51 Cal.4th 620, 632, fn. 8 [claim of trial court failure to instruct sua sponte requires no action of the defendant to preserve]; *People v. Rogers* (2006) 39 Cal.4th 826, 850, fn. 7 [claim of failure to instruct sua sponte not forfeited on appeal]; § 1259 [an appellate court may review any instruction given, even though no objection was made, if the substantial rights of the defendant were affected]), and therefore Roberts did not forfeit this claim.

The Attorney General also argues that Roberts' claim lacks merit because the trial court's instruction was a correct statement of law, and Roberts did not suggest any modifications to it. But as we have discussed, Roberts does not assert that the instruction regarding receiving stolen property was an incorrect statement of law. Rather, he contends that because the issue of whether the stolen property Roberts was alleged to have unlawfully received in counts 1 and 8 was actually stolen, the court had the duty to instruct sua sponte on the elements of "theft."

Roberts claims that the trial court erred when it failed to instruct the jury on the elements of "theft" because the nature of the property at issue in counts 1 and 8 as "stolen" was contested at trial. He raises two arguments in purported support of this claim. First, he contends there was no evidence as to the ownership of the ATVs at issue in count 1 and the tools at issue in count 8, and therefore there was a dispute as to whether Roberts intended to permanently deprive the owner of any property. Second, he asserts that because the ATVs were found close to the Bear Creek Road property--or on that property--in a ditch, there was an issue as to whether whoever took the ATVs intended to permanently--as opposed to temporarily--deprive the owner of possession of the ATVs.

25

With respect to Roberts' first argument, we disagree that the issue of the ownership of the ATVs and the tools at issue in counts 1 and 8 required the trial court to instruct sua sponte on the elements of theft. We discussed the evidence related to this argument *ante*. While the evidence suggests that it may have been possible that Charles owned the property at issue, there was evidence that Brad owned the property and acted as if it had been stolen, that Charles, even if he owned the property, did not legally dispose of it, and the circumstances of the theft demonstrate that the property was likely taken by breaking into a building and driving the property to the Dewer Road property on the ATV trails connecting the two properties. Accordingly, any dispute about the ownership of the property--which Roberts did not raise as an issue in closing--was not sufficient to require the court to instruct the jury sua sponte on the elements of theft.

Roberts next contends that the parties disputed whether defendant had the requisite intent to steal, requiring the trial court to instruct on the elements of theft. In closing, Roberts' attorney argued that the ATVs may not have been on Roberts' property when they were found, it was not clear that Roberts knew the ATVs were in the ravine, and that if someone were trying to steal the ATVs, they would "want to actually take them, not simply remove them from one property, take them a very short distance, and then dump them down a hill." He argued that "it could of [*sic*] just as easily been a couple of kids joyriding, talking [*sic*] these things out, going out for a spin, and then dumping them when they were done. [¶] Somebody who actually wants to steal something like that, possess it and make use of it, isn't going to just leave 'em out there. They're going to take them. They're going to remove them, so it's kind of questionable in that sense. [¶] I don't think there is sufficient proof to show that Mr. Roberts not only took the quads and possessed them, but even had knowledge, that he even had knowledge of their existence there." Roberts' attorney further argued that there were multiple people living on the Dewer Road property, and it was possible that someone else living on the property--or someone living in the nearby area--stole the ATVs. Similarly, Roberts'

26

attorney argued regarding count 8 that the tools may have been taken as abandoned property, and the evidence did not prove who brought the property to the Grass Valley location, where it was eventually recovered.

We disagree with Roberts that these arguments gave rise to a duty to instruct sua sponte. The ATVs were located in a ditch several months after they were reported stolen. Kurtis, who periodically checked on the property, reported them stolen to law enforcement. Whether the ATVs were actually on the Bear Creek Road property at the time of their discovery is irrelevant to the question of whether they were stolen, as opposed to the question of who stole them. Additionally, whether Roberts knew that the ATVs were in the ravine, or whether someone else stole them, are issues related to whether Roberts received stolen property, not whether the ATVs were stolen. Even if the person or people who stole the ATVs only intended to remove the ATVs from the property and then "dump[ ] them when they were done," the act of taking the ATVs with the intent of dumping them down into a ravine is sufficient to constitute permanent deprivation from the owner of the use and enjoyment of the property. In short, there is no evidence that the ATVs were merely being temporarily used with the intent to return them. Accordingly, we conclude that the evidence did not require the trial court to instruct the jury on the elements of theft regarding count 1.

Regarding the tools in count 8, Roberts contends that the evidence gave rise to the issue whether the tools were abandoned, which required the trial court to instruct sua sponte on the elements of theft. That argument is purely speculative; there was no evidence that Roberts believed the property was abandoned. Speculation is not evidence, let alone substantial evidence. The court's "duty to instruct on general principles of law and defenses . . . arises only when there is substantial evidence to support giving such an instruction." (*People v. Crew* (2003) 31 Cal.4th 822, 835.)

Accordingly, all the evidence shows that the property at issue in counts 1 and 8 was taken from the Bear Creek Road property with the intent to permanently deprive the owner--whether that owner was Brad or Charles--of possession. Therefore, the trial court did not err in omitting jury instructions defining "stolen" and "theft" because, unlike in *MacArthur*, *supra*, 142 Cal.App.4th 275, the evidence did not "suggest[ ] the property had been taken without the requisite intent" for theft. (*Id.* at p. 277.)

V

*Reasonably Near Standard*

Roberts next contends his conviction for count 8 must be reversed because there was a material variance between the allegations in the count, which alleged that the offense occurred between January 10 and 13, 2013, and the evidence adduced at trial, in which it was undisputed that the alleged offense could have occurred only between October 2013 and February 2014. We conclude that the variance was not material, and therefore reversal is not required.

A. *Procedural Background*

The consolidated information and subsequent amended informations alleged that Roberts committed the crime of receiving stolen air compressors, aluminum ramps, and a generator, "on or between" January 10, 2013, and January 12, 2013. The jury was instructed that the prosecution was not required to prove that the crime took place exactly on those days but only that it happened "reasonably close to those days." The evidence at trial was undisputed that the crime of receiving stolen property in count 8 could only have occurred between October 2013 and February 2014.

After trial, the prosecutor requested leave to amend the information to conform to proof. The trial court granted the request, and the prosecutor filed an amended information, which re-alleged that the offense charged in count 8 occurred "on or between" January 10, 2013, and January 12, 2013. To be clear, there was no change in the dates despite the leave to amend to conform to proof.

28

B. *Legal Background*

" ' "Both the Sixth Amendment of the federal Constitution and the due process guarantees of the state and federal Constitutions require that a criminal defendant receive notice of the charges adequate to give a meaningful opportunity to defend against them." ' [Citation.] Notice is supplied in the first instance by the accusatory pleading." (*People v. Hoyt* (2020) 8 Cal.5th 892, 923.) Accordingly, when the prosecutor alleges that a crime occurred "on or about" a certain date, there must be substantial evidence that the crime occurred "reasonably close" to that date. (*People v. Rojas* (2015) 237 Cal.App.4th 1298, 1304 [prosecutor must "prove the offense was committed . . . reasonably close" to the date alleged in the information].)

However, "[t]he true inquiry . . . is not whether there has been a variance in proof, but whether there has been such a variance as to 'affect the substantial rights' of the accused. The general rule that allegations and proof must correspond is based upon the obvious requirements (1) that the accused shall be definitely informed as to the charges against him, so that he may be enabled to present his defense and not be taken by surprise by the evidence offered at the trial; and (2) that he may be protected against another prosecution for the same offense." (*Berger v. United States* (1935) 295 U.S. 78, 82; see *People v. Hoyt, supra,* 8 Cal.5th at p. 923 [variance between pleading and proof at trial will be disregarded if it is not material; " '[t]he test of the materiality of a variance is whether the indictment or information so fully and correctly informs the defendant of the criminal act with which he is charged that, taking into consideration the proof which is introduced against him, he is not misled in making his defense, or placed in danger of being twice put in jeopardy for the same offense' "].) "A variance which does not affect the substantial rights of the defendant is harmless error." (*United States v. Tsinhnahijinnie* (9th Cir. 1997) 112 F.3d 988, 991.) The defendant must show that he was prejudiced by the variance. (*People v. Thomas* (1987) 43 Cal.3d 818, 828, 830.)

29

" '[I]n modern criminal prosecutions initiated by informations, the transcript of the preliminary hearing, not the accusatory pleading, affords defendant practical notice of the criminal acts against which he must defend.' " (*People v. Jones* (1990) 51 Cal.3d 294, 317.)  In other words, the information informs the defendant of what kinds of offenses he is charged with and states the number of offenses that can result in prosecution.  (*People v. Peyton* (2009) 176 Cal.App.4th 642, 657.)  The time, place, and circumstances of the charged offenses are left to the preliminary hearing.  (*Ibid.*)  Where defendant is not misled because he knows from testimony at the preliminary hearing the correct date of the offense, there is no fatal variance.  (*People v. Smith* (1958) 50 Cal.2d 149, 152.)  "Nor is he in danger of being placed in double jeopardy, for it is 'well settled that on a plea of double jeopardy, extrinsic evidence is admissible on the trial to identify the crime of which a defendant has been convicted.' " (*Ibid.*)

C. *Analysis*

Roberts contends that the variance between the date range provided in count 8 and the proof at trial violated his substantial rights because the prosecutor failed to prove that the criminal act occurred on a date reasonably near the date range identified in the indictment.  But Roberts has failed to show that he was not able to prepare a defense, nor has he shown any risk of being twice put into jeopardy, and therefore we conclude that any variance did not affect his substantial rights.

The high court has recognized that a variance between the information and the evidence at trial is prejudicial where the defendant prepares his defense based on the information.  (*Berger v. United States, supra,* 295 U.S. at p. 82.)  Accordingly, in *United States v. Tsinhnahijinnie*, *supra*, 112 F.3d at page 991, a panel of the Ninth Circuit Court of Appeals concluded that evidence of crimes committed in 1994 was insufficient to prove that the defendant committed similar crimes in 1992.  The court concluded that the variance prejudiced the defendant because he had presented alibi evidence for the dates identified in the indictment.  (*Ibid*.)  Similarly, in *United States v. Casterline* (1996) 103

F.3d 76, at page 78, a panel of the Ninth Circuit Court of Appeals concluded that the date specified in the indictment charging the defendant with unlawfully possessing a firearm did not satisfy the "reasonably near" standard because, on the date specified in the indictment, the defendant was in prison and had been for seven months. Thus, the defendant argued that he could not tell whether he had to defend his conduct only for the period reasonably near the specified date--for which he would have had an alibi--or whether he had to defend against the time period seven months prior, when he may have had access to guns. (*Ibid.*)

Unlike *Tsinhnahijinnie* and *Casterline*, the variance between the date identified in the information and the proof at trial did not materially affected Roberts' ability to defend against the charge offense. Indeed, Deputy Cissna testified at the preliminary hearing that she personally saw the items that later went missing when she went to the Bear Creek Road property in or around June 2013 on an unrelated investigation. She then testified that she contacted Kurtis on November 29, 2013, after she had obtained copies of the flyers he had prepared. During her conversation with Kurtis in November 2013, he told her about the items that were missing. Cissna further testified at the preliminary hearing that she met with Diane in March 2014, who told her that she heard noises consistent with ATVs in October and November 2013. On cross-examination during the preliminary hearing, Cissna testified that Kurtis had advised her about a broken wheel on one of the ATVs, which he had last seen in the summer of 2013. Thus, Cissna's testimony at the preliminary hearing clarified the timeframe in which the items were alleged to have been stolen and eliminated any possible confusion regarding the date of the alleged offense. Further, "[Roberts] [is not] in danger of being placed in double jeopardy, for it is 'well settled that on a plea of double jeopardy, extrinsic evidence is admissible on the trial to identify the crime of which a defendant has been convicted.' " (*People v. Smith*, *supra*, 50 Cal.2d at p. 152.)

31

Roberts contends that his defense in closing argument was that he could not have committed the offense in count 8 reasonably close to January 12, 2013, because the evidence was undisputed that the property had not been stolen until sometime after October 2013. But as we have discussed, while that may have been a tactic employed by counsel, Deputy Cissna's testimony at the preliminary hearing informed Roberts that the evidence was alleged to have been stolen between June 2013, when Cissna saw the property at the Bear Creek Road property, and November 29, 2013, when she spoke with Kurtis about the missing property. That date range was further clarified by Cissna's testimony about her discussion with Diane, who said that she heard ATV noises sometime in October or November 2013. Accordingly, we conclude that Roberts was fully informed of the timing of the charged offense, and any variance was harmless.

VI

*Roberts' Motion to Continue to Retain Counsel*

Roberts contends that the trial court abused its discretion by denying his motion to continue for purposes of replacing court appointed counsel for private counsel, which he made on the morning of trial. He argues the court's decision was arbitrary and capricious when considering that the court had previously granted 13 continuances, several of which were granted on the eve of trial, which had delayed the trial for over five years. We conclude the trial court did not abuse its discretion.

A. *Procedural Background*

On January 29, 2013, Roberts was arraigned on a complaint, and counsel Erik Davenport was appointed to represent him. Davenport represented Roberts throughout years of proceedings, including many continuances by the parties.

On May 21, 2019, the first day of jury selection, Roberts explained that he was dissatisfied with counsel's representation and wanted to proceed with a different attorney. The trial court held a hearing pursuant to *People v. Marsden* (1970) 2 Cal.3d 118; Roberts explained that his attorney had failed to explain what was happening, and he

needed an attorney who could help him. He expressed dissatisfaction with delays in his trial and that he did not know about the possibility of filing a motion pursuant to *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 until Shropshire filed one. He characterized Davenport's failure to file a *Pitchess* motion as "the final thing." Davenport acknowledged he did not file a *Pitchess* motion, but the court observed that it had found Shropshire's *Pitchess* motion to be lacking.[4] Roberts asserted that he did not know what his attorney had missed other than the *Pitchess* motion, and he needed "a fresh set of eyes looking over the case."

Davenport agreed that there had been "communication issues" in that he had met with Roberts to go over the case and the charges, but "there still seems to be a disconnect." Davenport explained there was not much more he could do to explain the case to Roberts, and he believed that he had represented Roberts adequately.

The trial court asked Roberts why he did not raise this issue at any time in the past, to which Roberts replied that he had "just been going with the flow" and that he had only just began wondering what else was being missed in his representation. Roberts then stated he had a friend who would loan him money to hire an attorney, but he did not previously request to hire his own attorney because he did not know he could after the court appointed counsel to represent him. He then acknowledged that he *did* know he could hire an attorney, but he could not afford to. His friend had only volunteered to loan him the money that day.

The trial court "understood [Roberts'] position" but found it "rather curious" that his request came on the first day of jury selection. It observed that Roberts' assertions on

---

[4] The trial court denied Shropshire's request for a continuance for a *Pitchess* motion on the basis that the information provided in the motion, and additional information provided ex parte during the hearing on the motion, failed to establish good cause for a continuance on the day of trial.

33

the day of trial that he had just learned both that he was permitted to hire a new attorney and that he could indeed afford to hire one "looks like a stalling tactic." Roberts said he did not want to delay trial, but under the circumstances, he needed a different attorney. The court denied Roberts' *Marsden* motion on the basis that the motion was brought on the day of trial, and the attorney-client relationship had not broken down such that delaying the trial was justified.

Roberts then moved to hire his own attorney on the same grounds. The trial court denied the motion, concluding it was untimely as made on the day of trial. The court stated: "[T]he People are ready to go. It's a five-year old case. Actually older than five years. The co-defendant is ready to go. Everyone is ready to go. [¶] And when we get a motion to seek private counsel at the defendant's own expense on the day of trial, it's generally not seen as anything other than a stalling tactic. Whether this is that or not I can't say, but I do know it's untimely. At this time it's inappropriate and the motion will be denied."

B. *Standard of Review*

We review the trial court's denial of Roberts' motion for continuance to obtain private counsel for an abuse of discretion. (*People v. Byoune* (1966) 65 Cal.2d 345, 346.) The court abuses its discretion only when it exceeds the bounds of reason, all circumstances being considered. (*Ibid.*) On appeal, the defendant has the burden to establish the court abused its discretion. (*People v. Strozier* (1993) 20 Cal.App.4th 55, 60.) "In deciding whether the denial of a continuance was so arbitrary as to violate due process, the reviewing court looks to the circumstances of each case, ' "particularly in the reasons presented to the trial judge at the time the request [was] denied." ' " (*People v. Courts* (1985) 37 Cal.3d 784, 791 (*Courts*).)

C. *Legal Background*

"The right of a criminal defendant to counsel and to present a defense are among the most sacred and sensitive of our constitutional rights." (*People v. Ortiz* (1990) 51

Cal.3d 975, 982.)  The right to assistance of counsel under the Sixth Amendment encompasses the right to retain counsel of one's choice.  (*People v. Holland* (1978) 23 Cal.3d 77, 86.)  However, the right to counsel of choice "is not absolute" (*People v. Stevens* (1984) 156 Cal.App.3d 1119, 1127) and "is circumscribed in several important respects" (*Wheat v. United States* (1988) 486 U.S. 153, 159).  A trial court has "wide latitude in balancing the right to counsel of choice against the needs of fairness, [citation], and against the demands of its calendar."  (*United States v. Gonzalez-Lopez* (2006) 548 U.S. 140, 152.)  Accordingly, the opportunity to secure counsel is limited by " 'the countervailing state interest against which the sixth amendment right provides explicit protection:  the interest in proceeding with prosecutions on an orderly and expeditious basis, taking into account the practical difficulties of "assembling the witnesses, lawyers, and jurors at the same place at the same time." ' "  (*Ortiz*, at pp. 983-984.)  Thus, a continuance "may be denied if the accused is 'unjustifiably dilatory' in obtaining counsel, or 'if he arbitrarily chooses to substitute counsel at the time of trial.' "  (*Courts*, *supra*, 37 Cal.3d at pp. 790-791; *People v. Blake* (1980) 105 Cal.App.3d 619, 624-625; *People v. Molina* (1977) 74 Cal.App.3d 544, 548 ["[T]he right [to be represented by private counsel] must be asserted in a timely fashion" and "the trial court may, in its discretion and without further inquiry, deny a motion for a continuance to secure new counsel if the motion is made during trial"].)  "However, 'a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality.' "  (*Courts*, at p. 791.)

In *Courts*, *supra*, 37 Cal.3d 784, our Supreme Court concluded the trial court had erred by denying an accused's request for a continuance to retain private counsel where the defendant had engaged in a good faith, diligent effort to obtain the substitution of counsel before the scheduled trial date.  The defendant had contacted the attorney he wished to retain nearly two months before trial, attempted to raise funds, informed the court of his efforts approximately one week before trial, and at the time of trial, an

35

attorney-client relationship had been established.  Thus, the facts of that case were "to be sharply contrasted with cases which have upheld the denial of a continuance on the ground that participation by a particular private attorney was still quite speculative at the time the motion for continuance was made." (*Id.* at p. 791, fn. 3.)  The court also contrasted the defendant's request for a continuance with "the eve-of-trial, day-of-trial, and second-day-of trial requests" made in other cases. (*Id.* at p. 792, fn. 4.)  The court explained that, "[i]n those cases, the Courts of Appeal found the lateness of the continuance request to be a significant factor which justified a denial where there were no compelling circumstances to the contrary." (*Ibid.*)

In *People v. Turner* (1992) 7 Cal.App.4th 913 at pages 919 to 920, the appellate court upheld the denial of a substitution motion brought the first day of trial.  The court explained that, faced with such a late substitution motion, "[t]he question [for the trial court] then became whether such a disruption was reasonable under the circumstances." (*Id.* at p. 919.)  The court approved of how the trial court considered the eleventh-hour motion because it "allow[ed] defendant to explain his dissatisfaction with [appointed counsel]." (*Ibid.*)  Based on the defendant's explanation, the trial court concluded he had not demonstrated an "adequate basis for permitting the disruption of a continuance," finding his complaints vague and possibly motivated by a dilatory purpose. (*Ibid.*)  The court explained:  "Whatever defendant's subjective intent, the substitution of counsel on the morning of trial would certainly have led to a continuance, and the trial court properly found that such a disruption would be unreasonable under the circumstances." (*Ibid.*)

In *People v. Lau* (1986) 177 Cal.App.3d 473 at page 479, the defendant asked to substitute retained counsel for appointed counsel on the first day of trial, "literally the moment jury selection was to begin."  After noting the motion was untimely, the trial court asked him to explain why he was dissatisfied with appointed counsel. (*Ibid.*)  After hearing argument, the court found the defendant's reasons were insufficient to warrant substitution. (*Ibid.*)  On appeal, the defendant argued the trial court violated his right to

counsel of choice, but the *Lau* court disagreed. It stated: "[T]he timeliness, or lack thereof, of the request properly concerned the [trial] court." (*Ibid*.) It concluded the trial court had properly denied the defendant's late motion after listening to his reasons for substitution and finding them insufficient. (*Ibid*.)

In *People v. Farley* (1968) 267 Cal.App.2d 214, a public defender was appointed to represent the defendant on the same day the information was filed. On the first day of trial, almost three months later, the defendant asked that the public defender be relieved. The defendant "told the court he did not have private counsel but would like to 'get' one and admitted that he had not tried to obtain a private lawyer." (*Id*. at p. 221.) "In the light of defendant's failure to tender sufficient cause to relieve the public defender and give a substantial reason for his request for private counsel coupled with the ample opportunity afforded him to obtain private counsel, his failure to do so and the fact that the request was made on the day of trial, we cannot say that the trial judge abused his discretion in denying the motion." (*Ibid*.)

D. *Analysis*

Roberts has failed to establish an abuse of discretion. The trial court was justifiably skeptical of Roberts' stated reasons for raising his concerns with appointed counsel on the first day of trial. Davenport had represented Roberts for more than six years before Roberts raised any concern about his representation, and Roberts first moved to replace Davenport on the day of trial. Roberts asserted that Davenport's failure to file a *Pitchess* motion was the "final thing," although, as the court recognized, Shropshire's *Pitchess* motion was denied as meritless. Without referring to anything specific, Roberts wondered what else was being missed with his representation, but there is nothing to suggest that Davenport had missed anything. Roberts then asserted that he had only just learned on the day of trial that he could replace his appointed counsel, but he then admitted that he knew earlier that he could replace appointed counsel with retained counsel. He also asserted that he had just found out that day that his unspecified friend

had volunteered to loan him money for an attorney. Roberts did not explain why that person had not offered to loan him money sooner. The court allowed Roberts to explain his dissatisfaction with appointed counsel, and it concluded that Roberts had not demonstrated an adequate basis for permitting the disruption of a continuance (*People v. Turner, supra*, 7 Cal.App.4th at pp. 919-920), characterizing Roberts' stated reasons to be "rather curious" and his request as "look[ing] like a stalling tactic."

Accordingly, the facts here are very different from those in *Courts*, in which the defendant had undertaken substantial efforts to locate an attorney, had informed the court before trial of his preference, and had entered into an attorney-client relationship before trial began. Conversely, here, Roberts was " 'unjustifiably dilatory' in obtaining counsel." (*Courts, supra*, 37 Cal.3d at pp. 790-791.) In the over six years of Davenport's representation, Roberts had made no effort to secure private representation until the day of trial. Thus, rather than having put an identifiable plan in place to secure private counsel, here the trial court was "confronted with the 'uncertainties and contingencies' of an accused who simply wanted a continuance to *obtain* private counsel." (*Id.* at p. 791.)

Roberts contends that his request would not have disrupted the orderly process of justice given the context of this case, in which the trial court had liberally granted numerous requests for continuance. But nothing in the record supports the proposition that the trial court did not consider the circumstances of the case. Rather, the court listened to Roberts' arguments and concluded that they did not warrant a continuance under the circumstances. We see no abuse of discretion.

VII

*Section 654*

Roberts contends, and the People agree, that the trial court erred by imposing two-year concurrent sentences for each of counts 12--possessing a sawed-off shotgun--and count 13--possessing that same shotgun as a felon. We agree with the parties that the

38

court was required to stay the punishment in one of the counts because both counts arose from the single act of possessing a single shotgun. (§ 654.)

In relevant part, section 654 provides: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (*Id.*, subd. (a).) "Section 654 does not allow any multiple punishment, including either concurrent or consecutive sentences." (*People v. Deloza* (1998) 18 Cal.4th 585, 592.)

Our Supreme Court has held "that a single possession or carrying of a single firearm on a single occasion may be punished only once under section 654." (*People v. Jones* (2012) 54 Cal.4th 350, 357.) Here, appellant possessed a single firearm on a single occasion and was punished twice. Under *Jones*, Roberts' sentence in count 13 must be stayed under section 654.

VIII

*Shropshire's Motion to Sever*

Shropshire contends that his conviction for manufacturing concentrated cannabis must be reversed because the trial court abused its discretion by denying his motion to sever multiple gun-related charges against Roberts. He argues joinder of all counts resulted in a denial of his federal and state constitutional rights to a fair trial and due process of law. (U.S. Const., Amends. V, XIV; Cal. Const., art. I, §§ 7, 15; *United States v. Dicesare* (9th Cir. 1985) 765 F.2d 890, 898; *People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 821; *People v. Soper* (2009) 45 Cal.4th 759, 783 (*Soper*).) As we will explain, we disagree.

A. *Standard of Review*

" 'As we often have observed, because consolidation or joinder of charged offenses ordinarily promotes efficiency, that is the course of action preferred by the law.' " (*People v. Hartsch* (2010) 49 Cal.4th 472, 493.) The denial of a motion to sever

is reviewed under the abuse of discretion standard. (*Soper*, *supra*, 45 Cal.4th at p. 774.) The defendant must make a clear showing of prejudice to establish that the trial court's denial of his motion to sever constituted an abuse of discretion. (*Ibid.*) A prejudicial abuse of discretion arises if the trial court's ruling falls outside the bounds of reason. (*Hartsch*, at p. 493.) When determining prejudice, the evaluation is made based on the record before the trial court when it made its ruling. (*Ibid.*)

B. *Procedural Background*

During the September 17, 2012, search of the Dewer Road property, Deputy Cissna found a 20-gauge bolt-action shotgun, a western style rifle, and a sawed-off shotgun Roberts' bedroom. These seizures led to Roberts being charged with one count of possession of a deadly weapon (§ 33215; count 12) and three counts of possession of a firearm by a felon (§ 29800, subd. (a)(1); counts 13-15). During the February 17, 2014, search of the Dewer Road property, Cissna found nine boxes of ammunition on his property, which led to Roberts being charged with one count of possession of ammunition (§ 30305, subd. (a)(1); count 5).

Shropshire moved to sever counts 12 through 15--but not count 5--from the remaining charges; he argued they were of a different class than the remaining charges, and their joinder was prejudicial to him. The prosecutor asserted counts 12 through 15 would be properly joined with count 5. The trial court denied the motion; it concluded that count 5 was sufficiently similar to counts 12 through 15.

C. *Legal Background*

Section 954 governs joinder of criminal charges and provides in pertinent part: "An accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under separate counts, and if two or more accusatory pleadings are filed in such cases in the same court, the court may order them to be consolidated." "The purpose underlying [§ 954] is clear: joint trial 'ordinarily

40

avoids the increased expenditure of funds and judicial resources which may result if the charges were to be tried in two or more separate trials.' " (*Soper*, *supra*, 45 Cal.4th at p. 772.)

Even where criminal charges are properly joined pursuant to section 954, a trial court may, in its discretion, order the different offenses to be tried separately for good cause. (*Soper*, *supra*, 45 Cal.4th at p. 774; see also *People v. Bean* (1988) 46 Cal.3d 919, 935 [this provision "reflects an apparent legislative recognition that severance may be necessary in some cases to satisfy the overriding constitutional guaranty of due process to ensure defendants a fair trial"].) Thus, when a trial court is faced with a motion to sever counts, it must determine whether joining the crimes would unduly prejudice the defendant. Cross-admissibility is often the crucial factor affecting prejudice. (*Soper*, at pp. 774-775.) If evidence on each of the joined crimes would have been cross-admissible in hypothetical separate trials, this factor alone usually dispels any inference of prejudice. (*Ibid.*)

However, lack of cross-admissibility itself will not establish prejudice or an abuse of discretion by the trial court in denying severance. (*Soper*, *supra*, 45 Cal.4th at p. 775.) If the evidence would not be cross-admissible in separate trials, we will consider " 'whether the benefits of joinder were sufficiently substantial to outweigh the possible "spill-over" effect of the "other-crimes" evidence on the jury in its consideration of the evidence of defendant's guilt of each . . . offense[].' " (*Ibid.*) "In making *that* assessment, we consider three additional factors, any of which—combined with our earlier determination of absence of cross-admissibility—might establish an abuse of the trial court's discretion: (1) whether some of the charges are particularly likely to inflame the jury against the defendant; (2) whether a weak case has been joined with a strong case or another weak case so that the totality of the evidence may alter the outcome as to some or all of the charges; or (3) whether one of the charges (but not the other) is a capital offense, or the joinder of the charges converts the matter into a capital case. [Citations.]

41

We then balance the potential for prejudice to the defendant from a joint trial against the countervailing benefits to the state." (*Ibid*.)

D. *Analysis*

The first issue is whether the evidence supporting counts 12 through 15 would have been cross-admissible in a hypothetical trial of the remaining counts. (*Soper*, *supra*, 45 Cal.4th at pp. 774, 776.) However, we do not reach this issue because it is clear that, even if the evidence would not have been cross-admissible, " 'the benefits of joinder were sufficiently substantial to outweigh the possible "spill-over" effect of the "other-crimes" evidence on the jury in its consideration of the evidence of defendant's guilt of each . . . offense[].' " (*Id.* at p. 775.)

Shropshire argues that the gun-related evidence in counts 12 through 15 inflamed the jury against him because the evidence supported the inference that he was engaged in a criminal enterprise. However, there was overwhelming evidence that Shropshire *was* engaged in a criminal enterprise, including substantial evidence that he was manufacturing concentrated cannabis and the presence of multiple pieces of stolen property found during the search of the Dewer Road property. Moreover, even if the evidence of the guns were not admitted, the evidence supporting count 5--nine boxes of ammunition--would still have been admitted. Accordingly, there would have been evidence that Shropshire lived on a property where firearms were contemplated, even if no evidence of guns were admitted. Further, each of the guns was found in Roberts' bedroom, not the RV where Shropshire lived, so the connection of the guns to Shropshire was attenuated in that respect. Finally, two of the three guns seized were only illegal because Roberts was not lawfully permitted to own guns; the other gun was illegal because the barrel of the shotgun was three inches too short. In other words, this case does not involve the possession of an arsenal such that might be required to defend a criminal enterprise, nor was there any evidence that defendants engaged in any kind of

violent behavior.  Accordingly, there is nothing to suggest that the jury would have been inflamed by evidence that there were guns on the property.

Shropshire also argues that the evidence helped to fill a critical gap in the prosecution's case, in that there was no evidence found in the RV linking Shropshire to the manufacturing of concentrated cannabis.  Besides the obvious factual deficiency in that argument--Deputy Cissna testified that she found equipment for producing concentrated cannabis, and marijuana and concentrated cannabis residue in and around the RV, along with indicia related to Shropshire--we fail to see how admitting evidence of guns seized on the property constitutes joining a stronger case with a weaker case to bolster the weaker case.  The evidence of the gun-related evidence and the manufacturing charge against Shropshire do not bolster one another.  Moreover, as we have discussed, to the unlikely extent evidence of the guns would arguably allow the jury to find that Shropshire was part of an armed criminal enterprise, the jury would have been able to reach a similar finding through the presence of ammunition on the property.

There is nothing to suggest that Shropshire was prejudiced by not severing counts 12 through 15 from the remaining counts; therefore, we conclude Shropshire has failed to make a "clear showing of prejudice to establish that the trial court abused its discretion in denying . . . defendant's severance motion."  (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1220.)

IX

*Shropshire's Section 667.5 Enhancement*

Shropshire contends his one-year prior prison term enhancement imposed pursuant to section 667.5, subdivision (b) must be stricken pursuant to the amendment to section 667.5, subdivision (b) by Senate Bill No. 136 (2019-2020 Reg. Sess.) (Senate Bill No. 136) effective January 1, 2020, and the People agree.

43

On October 8, 2019, the Governor signed Senate Bill No. 136 into law. The new law, which became effective on January 1, 2020, amends section 667.5, subdivision (b), which formerly imposed a one-year sentence enhancement for each separate prior prison term or county jail term imposed under section 1170, subdivision (h) where defendant had not remained free of custody for at least five years. (Former § 667.5, subd. (b). ) Pursuant to Senate Bill No. 136, a one-year prison prior enhancement now applies only if a defendant served a prior prison term for a sexually violent offense as defined in Welfare and Institutions Code section 6600, subdivision (b). (See Stats. 2019, ch. 590, § 1.)

Because Shropshire's sentence was not final when Senate Bill No. 136 took effect, and because his prior offenses were not for sexually violent felonies, we agree with the parties that the amended law applies to defendant retroactively. (See *People v. Vieira* (2005) 35 Cal.4th 264, 306 [defendant entitled to retroactive application of criminal statute that takes effect during the time defendant has to appeal to the United States Supreme Court]; *In re Estrada* (1965) 63 Cal.2d 740, 742; *People v. Lopez* (2019) 42 Cal.App.5th 337, 341-342.) Therefore, we modify the judgment to strike defendant's one-year prior prison term. We need not remand this matter for resentencing, as the trial court already imposed the maximum sentence available. (See *Lopez*, at p. 342.)

## DISPOSITION

The judgments are modified to strike Shropshire's one-year prior prison term enhancement (§ 667.5, subd. (b)) and to award him presentence credit for his time in custody following the completion of his reduced misdemeanor sentence in Placer County case No. 62-128342, and to stay Roberts' sentence on count 13 (§ 654). As modified, the judgments are affirmed. The trial court is directed to prepare an amended abstract of judgment for each defendant reflecting these modifications and to forward a certified copy thereof to the relevant authorities.

<br>

                                                /s/

                                              Duarte, J.

<br>

We concur:

<br>

    /s/

Robie, Acting P. J.

<br>

    /s/

Mauro, J.

<br>